IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LYNN McDONALD-CUBA,

       Plaintiff,

vs.                                                                    NO. 09-CV-554 WJ/DJS

SANTA FE PROTECTIVE SERVICES, INC,

       Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon a Motion for Summary Judgment on the First Amended and Supplemental Complaint filed on February 22, 2010 by Defendant Santa Fe Protective Services, Inc. **(Doc. 65)**.  Having considered the parties' briefs and the applicable law, I find that Defendant's motion is well-taken and will be granted.

### Background

In this employment case, Plaintiff claims gender discrimination and retaliatory discharge by Defendant in violation of  Title VII  (42 U.S.C. § 2000e, et seq.) and the New Mexico Human Rights Act, NMSA 1978 § 28-1-7(A) ("Human Rights Act").[1]

## I.      Parties' Positions

Defendant Santa Fe Protective Services, Inc. ("SFPS") is a New Mexico corporation in the business of providing security services with its principal place of business in Bernalillo County.  Plaintiff contends that SFPS gave preferential treatment to male directors in the

---

[1] Count I alleges gender discrimination in Violation of Title VII and the Human Rights and Count II alleges retaliation under Title VII and the Human (42 U.S.C. § 2000e, et seq.) and the New Mexico Human Rights Act, NMSA 1978 § 28-1-7(A) ("Human Rights Act").

company, including giving them greater percentage bonuses and that Defendant retaliated against Plaintiff by terminating her after she complained to management about the pay disparities. At the same time, Plaintiff claims that she was terminated because of a perceived conflict of interest regarding her involvement with a company which she and her husband owned.

Defendant's position is that Plaintiff was in reality treated more favorably than the male directors with regard to promotions and salary.  Defendant claims that Plaintiff was terminated because while she was working for SFPS, Plaintiff became a majority owner of a rival company which was started by her husband Terry Cuba, whom Plaintiff married while they both worked for Defendant.  Mr. Cuba had been previously employed by SFPS as its Chief Operating Officer, but left the company to start another business which parties dispute is a business competitor. Mr. Cuba stopped working for SFPS while Plaintiff stayed on, and started a company which Defendant claims to be a business competitor.  Plaintiff owned a majority share in that other company at the time she was terminated by SFPS.

## II.      Undisputed Facts[2]

Plaintiff was employed by SFPS from February 9, 2005 to December 7, 2007, for a period of almost three years.  Her starting salary was $30 per hour, without benefits.  Plaintiff's work was clerical and accounting, but did not include payroll.  Parties dispute whether Plaintiff had previous accounting training prior to working at SFPS, but it is undisputed that she held no relevant specialty certification, and that she had not earned a college degree before or during her

---

[2]  These facts are supported by exhibits attached to the pleadings. Because both parties designated their exhibits by letter (and the Motion and Reply both start with "Exhibit A," the Court is forced to refer to the specific pleading to which the exhibit is attached.

employment at SFPS.  Plaintiff's sister was the CPA for SFPS at the time when the underlying incidents occurred.

In September 2005, Plaintiff was offered a full-time position as a financial accounting manager, going from an hourly to a salaried position, at an annual starting salary of $58,000. Plaintiff also received medical benefits.  However, Plaintiff's duties did not change.  At some point in her employment, President Christina Maki gave Plaintiff an increase in salary when Plaintiff declined medical benefits.[3]

In April 2006, Plaintiff received a 13% salary increase consisting of 5% for a performance increase and another 8% equal to the company's portion of her unused medical insurance premiums.  In December 2006, Plaintiff received a $2,000 bonus.  At her request, Plaintiff was allowed to work four 10-hour days per week instead of the normal five 8-hour days. Mark Liming, who was the Director of Business Development at SFPS, typically worked more than 60 hours per week during the same relevant period of time.

In February 2007, Plaintiff was promoted to the position of Director of Accounting and Finance at a salary of $69,789.  A reason for the promotion was Plaintiff's complaints about discrimination against females, specifically that the females were "managers" where the males were "directors."  Ms. Maki testified that Plaintiff "continued on and on; . . . so, to make her feel better, I promoted her." Mot., Ex. C (Maki Dep.) at 165:15-166:5.  Ms. Maki kept on "giving

---

[3] Plaintiff disputes the use of the word "declined," but it appropriately describes the situation.  When Plaintiff married Terry Cuba in April 2006, she was put under her husband's medical benefit plan at SFPS.  Plaintiff requested that the deductions that had previously been taken from her salary be returned to her paycheck.  As a result, she received a 5% increase in her salary.  Mot., Ex. B(Maki Dep.) at 43:12-20.

and giving" to appease Plaintiff.  Maki Dep. at 168:10-13.[4]

Some time around November 2007, Plaintiff verbally complained to Sherry Meier, Director of Human Resources, about perceived disparities in male and female director salaries. According to Defendant, Ms. Meier asked Plaintiff if she wanted to file a formal complaint, but Plaintiff declined to do so, and stated that she felt she had a "good enough rapport" with Ms. Maki to inform Ms. Maki herself.  Mot., Ex. C at 63-64.  However, Plaintiff disputes that Ms. Meier asked Plaintiff if she wanted to file a formal complaint, and states that instead it was Ms. Meier who complained to Plaintiff in June 2007 that Mr. Liming and Brett Addudul, Director of Operations, had received salary increases that were higher than 6%, even though the understanding was that no one would get an increase higher than 6%.  Plaintiff also states that in November 2007, she told Ms. Meier that she was going to write to Ms. Maki about her concerns regarding the higher salary increases.

In June 2007, Plaintiff and her husband, Mr. Cuba, formed a company called Brahma Defense Enterprises, LLC ("Brahma Defense").   There is disagreement on the issue of whether Brahma Defense was in direct competition with SFPS, with Plaintiff contending that Brahma Defense was set up for the purpose of consulting and training in the security and labor relations filed, not the provision of security guards and patrol services.  Plaintiff  disputes Defendant's contention that she misled Ms. Maki or anyone else at SFPS into believing that Brahma Defense was doing consulting work for unions and nothing else, and that Brahma Defense was not going after the same contracts.

Brahma Defense's security guard code as defined by the North American Industry

---

[4]  Plaintiff does not dispute these facts.  Resp. at 2.

Classification System ("NAICS")[5] means that it was providing security guard and patrol

services.  Ms. Maki learned of Brahma Defense's Current CCR Registration Status in early

December, 2007.  The CCR Registration Status listed: (a) the name of the business as Brahma

Defense Enterprise; (b) the business type as "minority owned business" and "woman owned

business"; (c) the NAICS classification as 561612 - "Security Guards and Patrol Services"; (d)

listed Plaintiff as "Electronic Business Primary POC ["Point of Contact"]," "Past Performance

Alternate POC," and "Government Business Alternate POC." Mot., Ex. A-1 (att. to Maki Aff.)

Plaintiff claims,however, that Brahma's selection of the NAICS code 561612 on its Central

Contractor Registry ("CCR") report meant did not mean that Brahma was providing security

guard and patrol services.

Plaintiff was the majority owner of Brahma Defense.  As Director of Accounting and

Finance at SFPS, Plaintiff also knew confidential information, for example, costing or technical

information, labor rates, fees and overhead rates, which could assist another company such as

Brahma Defense bid against SFPS on contracts. Plaintiff was terminated from SFPS on either

December 6 or 7, 2007.  Defendant states that Plaintiff's termination was because of her conflict

of interest and for misleading her employer.  Plaintiff disputes whether her termination was for

misleading her employer, contending that Ms. Maki had told her at her termination that the

reason she was firing Plaintiff was for a conflict of interest regarding Plaintiff's ownership

---

[5] Parties did not provide the full name for "NAICS," but the Court took judicial notice that it stands for North American Industry Classification System, based on an Internet search. *See* http://www.census.gov/eos/www/naics/product_classification/prodclassification.html; *Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003) (noting judicial notice of website appropriate) (citing Fed.R.Evid. 201); *Triplet v. Franklin*, unpubl. opin., 2010 WL 409333 (10th Cir. 2010) (noting that court may take judicial notice of website's contents, "assuming its authenticity has not been challenged and it is capable of accurate and ready determination"); *Francarl Realty Corp. v. Town of East Hampton*, 628 F.Supp.2d 329 (E.D.N.Y.2009).

interest in Brahma Defense.

## Discussion

Plaintiff contends that Defendant discriminated against her by giving male directors of the company greater percentage bonuses, and by ignoring male directors' conflicts of interests with the company's interest.  She also alleges that SFPS punished Plaintiff by terminating her for a perceived conflict of interest regarding her involvement with Brahma Defense.  Plaintiff claims that Defendant retaliated against her by terminating her because she complained to management about pay disparities between male and female directors.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. PRO. 56(c); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  Once that burden is met, the nonmoving party must put forth specific facts showing that there is a genuine issue of material fact for trial; he may not rest on mere allegations or denials in his own pleadings.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986).  In order to avoid summary judgment, the nonmoving party must put forth enough evidence that a reasonable jury could return a verdict in the nonmovant's favor.  *Id.* at 249.  A mere scintilla of evidence in the nonmovant's favor is not sufficient.  *Id.* at 252.

## I.        Discrimination Claims

Plaintiff premises her discrimination claims in Count I on the basis of both disparate pay and wrongful termination: first that Defendant gave male directors Bret Aduddell and Mark Liming salary increases over the six percent SFPS represented as the highest increase anyone

6

would receive in 2007.  Second, Plaintiff alleges that she was discriminated by her termination for an alleged conflict of interest in her ownership of Brahma Defense, when Defendant allegedly ignored similar conflicts for male directors.  In Count II, Plaintiff alleges that she was terminated because of her complaint of gender discrimination.  She also contends that SFPS retaliated against her by filing a counterclaim after she filed a post-employment charge of discrimination.

I agree with Defendant that it is impossible to pin down Plaintiff's basis for her wage discrimination claim, and that it is also impossible to know whether Plaintiff has changed her mind about proceeding on this claim.  For example, in the Joint Status Report, Plaintiff's wage discrimination claim is based on disparity in bonuses.  *See* Doc. 18 at 3 (stating that Defendant "discriminated against her and other female employees based on gender by giving male directors of the company greater percentage **bonuses** than Plaintiff and other female directors. . . ." However, in her First Amended Complaint, Plaintiff bases her allegations of wage discrimination on "higher annual percentage pay increases in 2007."  Doc. 46 at ¶ 11. In addition to being unclear as to the basis for her wage discrimination claim, Plaintiff seems confused as to whether she intends to allege wage discrimination.  For example, in her response she alleges discrimination based on Defendant giving males Bret Aduddell and Mark Liming salary increases over the six percent when SFPS told everyone was the highest increase anyone would receive in 2007. Resp. at 5.  At the same time, Plaintiff states (in the same pleading) that she "did not bring a compensation discrimination claim in the first place. . . ."  Resp. at 14.

By way of explanation, Plaintiff insists that her Title VII discrimination claim "is a disparate treatment claim, not a wage discrimination claim."  Resp. at 5.  This only confuses matters further. Plaintiff may split hairs about whether this is a wage discrimination claim based

7

on gender, or a gender discrimination based on pay disparity – the end result is the same. Plaintiff correctly infers that this is not a claim brought under the Equal Pay Act, but completely ignores the fact that Title VII prohibits discrimination based on pay or compensation.[6]

Defendant contends that Plaintiff has abandoned her wage discrimination claim because of the lack of clarity surrounding the alleged conduct on which that claim is based. The Court disagrees on that point. Metaphorically speaking, Plaintiff appears to be either intellectually lost and afloat on the high seas of employment law, or is frantically switching oars to find some parcel of dry land. Either way, Plaintiff has sufficiently made out a claim (inartful though it is) for Title VII disparate treatment. The bad news for Plaintiff, however, is that neither theory holds any water.

A.      Gender Discrimination Based on Pay

Based on the submissions of Plaintiff, the Court believes that Plaintiff is asserting that Defendant discriminated against her by giving male directors Bret Aduddell and Mark Liming salary increases over the stated six percent.

To prevail on a disparate treatment claim under Title VII, a plaintiff must show that her employer intentionally discriminated against him for a reason prohibited by the statute – in this case, based on Plaintiff's gender. *See Salguero v. City of Clovis*, 366 F.3d 1168, 1178 (10th Cir.

---

[6] Plaintiff is under the mistaken impression that claims alleging wage disparity can be brought under only the Equal Pay Act. The latter differs from Title VII in one way by imposing a "form of strict liability on employers who pay males more than females for performing the same work." *Mickelson v. New York Life Ins. Co*., 460 F.3d 1304, 1310 -1311 (10th Cir. 2006). However, Title VII prohibits an employer from "discriminat[ing] against any individual with respect to the, terms, conditions, or privileges of employment, because of such  individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1) (emphasis added); *see Green v. New Mexico Dept. of Labor*, 420 F.3d 1189 (10th Cir. 2005). Thus, Plaintiff's efforts to distance her claim here from a wage discrimination claim is quite unsuccessful – that is exactly what it is.

2004) ("[Title VII] prohibits only intentional discrimination *based upon* an employee's protected class characteristics."). Where a plaintiff relies upon circumstantial evidence, as in this case, the Court uses the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If the plaintiff establishes a prima facie case, a presumption of discrimination arises. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the defendant carries its burden of production, the presumption of discrimination drops out of the case. *Jaramillo v. Colorado Judicial Dept*, 427 F.3d 1303 (10th Cir. 2005) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11 (1993)). The burden then shifts back to the plaintiff, who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination. *Id.* (citing *Rivera v. City & County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004)).

Presenting a prima facie case is slightly different under Plaintiff's two theories. For her disparate treatment claim based on unequal pay, Plaintiff can make out a prima facie case of discrimination by showing: (1) that she belongs to a protected class; (2) that she suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir.2000). One way a plaintiff may raise an inference of discrimination is by showing that the employer treated similarly situated employees more favorably. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800-01 (10th Cir.2007).[7]

---

[7] The Tenth Circuit has noted that a prima facie case may not require a "similarly-situated person" comparison at all. *See Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th

In a Title VII claim alleging pay discrimination, the plaintiff always bears the burden of proving that the employer intentionally paid her less than a similarly-situated male employee. *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1310 -1311 (10th Cir. 2006).  Individuals are considered "similarly-situated" when they (1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *MacKenzie vs. Denver, City And Co.*, 414 F.3d 1266 (10th Cir. 2005).

Plaintiff claims that Mr. Aduddell and Mr. Liming were subject to the same six percent salary increase cap in 2007 as she was, the same policy on written performance evaluations as a basis for salary increases in 2007, and yet both of these individuals received annual percentage salary increases in that year.  While Plaintiff is correct that they were all subject to the same "cap," they were not at all similarly situated with regard to their job duties and responsibilities within SFPS.

Ms. Maki's affidavit unequivocally demonstrates that Plaintiff's job duties and responsibilities were very different from those of Liming and Mr. Aduddell.  Mot., Ex. A.  Mark Liming was the Director of Business Development and Director of Operations.  He was in the business of developing business for the company.  According to Ms. Maki, Mr. Liming was

---

Cir. 2004).  Some cases have framed the relevant fourth element much more broadly, as requiring a showing of "circumstances giving rise to an inference of discrimination."  *Id.*  Both parties argue the fourth element based on the "similarly situated" comparison.  The Court will also keep in mind the more generic and flexible standard.  *See Hysten v. Burlington Northern & Santa Fe Railway Co.*, 296 F.3d 1177, 1180 (10th Cir. 2002) (stressing that "courts must be sensitive to the myriad of ways such an inference can be created"); *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1134, n.6 (10th Cir. 2004) ("The precise articulation of what is required to establish a prima facie case may vary somewhat depending on the context of the plaintiff's claim).

responsible for oversight and management for all commercial and Government Contracts, and frequently consulted with customers to recommend solutions and improvements.  His typical work week exceeded 60 hours, including nights and weekends.  His position required, among other things, the ability to investigate, analyze and resolve complex security problems as well as project development.  Mr. Liming also made hiring, disciplinary and termination decisions, and prioritized and assigned work. Mot., Ex. A (Maki Aff.).  Mr. Aduddell was the Director of Operations.  He investigated and resolved complex security questions, worked on program and project development and supervised operations.  Mr. Aduddell shared responsibility for hiring, disciplining and terminating employees.  He also shared responsibility in the company for strategic development and resource allocation.

Plaintiff was initially a part-time bookkeeper, who became a full-time employee. These duties included clerical work and accounting, but not payroll, preparing workers compensation reports, collections activities, business license renewal, and maintenance of adequate filing systems.  Plaintiff did some costing work under the supervision of Ms. Maki.  Plaintiff's duties remained constant throughout her tenure.  Plaintiff worked 40-hour weeks, divided into four 10-hour days at Plaintiff's request.  Plaintiff disputes none of these facts, nor does she add any facts which would modify Ms. Maki's description of her position at SFPS. As a result, Plaintiff cannot show a prima facie case of pay discrimination because she has not shown she was similarly situated to the male directors about whom she complains.

B.      Shifting Burden Analysis

Even if the Court were to ignore the facts which undisputedly show that Plaintiff's job position was completely different in its nature and its demands as compared to those of Mr. Liming and Mr. Aduddell, Plaintiff still could not withstand summary judgment.  Mr. Liming

concedes that he received an annual salary increase in 2007 that amounted to a 16% increase, in that in 2007 he went from $60,000 to $70,000. Resp., Ex. B at 182-83. Plaintiff's salary in 2007 was $69,789. Mr. Aduddelll's salary in 2007 was $68,000. They both received $2,000 bonuses. Plaintiff contends that Mr. Aduddelll's salary increase was more than 6%. This could infer more favorable treatment to male directors (again, one would be required to first find that Plaintiff was similarly situated to Mr. Liming and Mr. Aduddell). However, the problem with proceeding past a prima facie case is that the Plaintiff would be completely unable to show any evidence of pretext.

Defendant offers legitimate reasons for any perceived annual percentage salary increase for Mr. Liming and Mr. Aduddell that amounts to more than six percent. Both individuals had taken on a significant increase in responsibilities which was reflected in their salary increases. Mr. Liming acknowledged that he received a 16% increase, with his salary going from $60,000 to $70,000. Resp., Ex. B at 182-83. However, the 6% increase was added to his base salary, with the remaining $6400 as an "equity adjustment" based on the increased responsibilities he had undertaken and based on the fact that he had not received an increase in over two years, in contrast to other employees (except for Mr. Aduddell). Resp., Ex. B at 182-83; 185:20-25; Resp., Ex. C at 222:19-25. Similarly, Mr. Aduddell received a higher than 6% salary increase because he had not received an annual increase for over a year. Mot., Ex. C (Maki Dep. at j170:7-14; 173-174).

Plaintiff cannot overcome Defendant's presentation of legitimate reasons for any alleged pay discrepancy because she cannot show any evidence of pretextual motive. Pretext can be shown by "revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence." *Mickelson*, 460 F.3d at 1315.

When Plaintiff started working full-time, she was paid more than Mr. Liming.[8]  Her salary was higher than that of Mr. Liming or Mr. Aduddell; her 2006 bonus of $2,000 matched Mr. Aduddell's bonus, but was less than Mr. Liming's bonus of $3,500 in 2006.  Plaintiff does not dispute any of the material facts which dispel her allegations of treating either male director more favorably (even assuming that they are similarly situated – which they are not). She does not dispute that the higher than 6% increase reflected the fact that the duties of both male directors were expanded and that neither of the male directors had received increases in recent years, nor does she offer any evidence to suggest that she was similarly situated on that point.  In short, Plaintiff presents no evidence that Defendant's reasons for paying both male directors higher salary increases were pretextual.

If anything, Plaintiff was more favorably treated than other employees, including the male directors.  In April of 2006, Plaintiff received essentially a 13% salary increase when she requested an increase in pay after going on her husband's medical plan.  Mot., Ex. B (Pltff's Dep.) at 43-45.  Ms. Maki granted Plaintiff's request, and did not increase the salary of any other employee who was not using the company's medical plan.  Mot., Ex. C (Maki Dep.) at 168:14-19.   Plaintiff was allowed to work 40 hour weeks, divided into four 10-hour days.  She requested from Ms. Maki, and received, a window office and job title of director. Reply, Ex. B at 167:1-11.  While Plaintiff attributes a discriminatory motive to Ms. Maki's acquiescence, no reasonable juror with any common sense would consider receiving a new job title and window office as showing a discriminatory motive.  Also at her request, Plaintiff worked 40 hour weeks,

---

[8]  In February 2007, Plaintiff's salary was $69,789; Mr. Liming's salary at the same point in time was $60,000.  Mot., Ex. A (Maki Aff.) at 2.

divided into four 10-hour days.

Plaintiff's other arguments, which are meant to show pretext for discriminatory motive, are totally devoid of merit.  For example, as evidence of discriminatory motive, Plaintiff points out that she and Ms. Meier received written evaluations while there is no written documentation for performance reviews for Mr. Addudell and Mark Liming.  However, there is no evidence that the women were supervised by the same individuals as the male directors, and even more importantly, there is no evidence of any connection between the existence of written performance evaluations and any alleged pay disparities.

On this claim, Plaintiff has not met a prima facie case nor has she shown any evidence of pretext. Therefore, Defendant is entitled to summary judgment on  Plaintiff's claim of gender discrimination based on pay.

B.      Gender Discrimination Based on Termination

Plaintiff contends that Defendant discriminated against her by terminating her for perceived conflicts as owner of Brahma Defense, the company she and her husband, Mr. Cuba, owned.  She claims that SFPS ignored similar conflicts which the male directors had, and only punished her for the same conduct.

For her disparate treatment claim based on wrongful termination Plaintiff can show a prima facie case by showing that 1) she belongs to some protected class, (2) she was qualified for the position or benefit at issue, (3) she suffered an adverse employment action, and (4) that she was treated less favorably than others. *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193 (10th Cir. 2006).

14

SFPS had in place a "Conflicts of Interest Policy"[9] which defined "conflict of interest" as any situation in which an employee was "not able to remain impartial or maintain objectivity in choosing between the interests of SFPS and [self-interest]." Examples of conflicts included when an employee or member of that employee's family "can benefit or be perceived as benefitting directly or indirectly from a relationship with a supplier, customer, competitor or other person or company that deals with SFPS." The policy also stated that "[m]ost often potential conflicts occur because you have access to confidential information . . . ." Doc. 83-2. Having conflicts or potential conflicts of interest could be grounds for immediate dismissal. Resp., Ex. D at 79:13-19.

Plaintiff does not dispute that she was majority owner of Brahma Defense while she was employed at SFPS; that Brahma Defense was an active company during that time; and that she knew confidential information at SFPS which could help another company (including her own) bid against SFPS. Plaintiff is correct that Mr. Liming and Mr. Aduddell were subject to the same company policy regarding conflicts of interest – but the similarity between Plaintiff and these other two individuals ends there.

1.    *Mr. Aduddell and Alpha Pro*

During his employment with SFPS, Mr. Aduddell owned Alpha Pro, which was a company dealing in security services. However, Mr. Aduddell disclosed this affiliation to Ms. Maki prior to being hired at SFPS. Resp., Ex. C at 244-45. Ms. Maki was informed by Mr. Cuba, who hired Mr. Aduddell, that Mr. Aduddell had suspended his business license so that he could not perform any work under that company and thus, not operate in competition during his

---

[9] Defendant's Conflicts of Interest Policy is provided as attachment to the Resp., Ex. B (Liming Dep.).

employment with Defendant.  At the time, Ms. Maki relied on Mr. Cuba's representations that
Mr. Aduddell's license was inactive, but she saw the documentation herself when reviewing the
paperwork in connection with Plaintiff's lawsuit against the company.  Ex. C at 245-46.  In her
deposition, Ms. Maki made it quite clear that, if Mr. Aduddell never suspended the license as he
represented, she would have terminated him immediately. Resp., Ex. C at 250-251.

       In contrast, Plaintiff never disclosed her exact affiliation with Brahma Defense which she
and her husband owned, nor fully explained the nature of the company's business until Ms. Maki
confronted her with the information.  On December 5, 2007, one or two days before Plaintiff was
terminated, an employee of SFPS showed Ms. Maki a copy of the CCR report concerning
Brahma Defense which prompted Ms. Maki to investigate the status of that company.  Ms. Maki
concluded that Plaintiff's ownership of a majority interest in Brahma Defense created a "huge
conflict of interest" in that the company was in "direct competition" with SFPS.  Resp., Ex. C at
13:22-25; 14:17-21.  Ms. Maki also felt that Plaintiff had "misled" her into believing that Mr.
Cuba had been running only a consulting company for unions, rather that a company which
provided security services.  Thus, Plaintiff cannot claim that Defendant punished her for conduct
which was similar to Mr. Aduddell's conduct because Mr. Aduddell disclosed his ownership and
suspended his license to operate the business which would have been in competition with
Defendant.

       Plaintiff concedes that Ms. Maki believed that Alpha Pro was inactive while Mr.
Aduddell was employed by SFPS until his departure in 2008.  Resp. at 11 (citing Ex. C, Maki
Dep. at 244-50).  However, Plaintiff claims that while pursuing her unemployment benefits after
termination, she investigated the status of Alpha Pro and discovered that the company had in fact
been active during Mr. Aduddell's employment with SFPS.  She claims that the Articles of

16

Amendment for Alpha Pro pulled from the Colorado Secretary of State website indicates that the company was active during a specific period of time. Resp., Ex. A-1. Plaintiff also states that someone at the Colorado Secretary of State's office advised her that Alpha Pro was "in good standing and that I could do business with it at that time." Resp., Ex. A , ¶ 11. There are considerable problems associated with this evidence in that none of it gets Plaintiffs closer to showing pretextual motive on the part of Defendant. The Articles of Amendment attached as Exhibit A-1 do not provide any information regarding the active or inactive status of Alpha Pro. Also, statements made to Plaintiff by someone over the phone are inadmissible hearsay. Even more importantly, none of this constitutes evidence that Ms. Maki treated Mr. Aduddell more favorably on the basis of gender.

Plaintiff contends that she did not mislead Ms. Maki regarding Brahma Defense and suggests that Ms. Maki's failure to investigate into what Brahma Defense actually did and Plaintiff's involvement in the company creates an inference of discrimination. It does not. The question here is not whether Alpha Pro was or was not active during Mr. Aduddell's employment with SFPS; or whether Plaintiff actually misled Ms. Maki regarding Brahma Defense. Rather, the pertinent issue is whether in terminating Plaintiff, Ms. Maki was acting under a reasonable and good faith belief on both issues. *See Kendrick v. Penske Tranp. Serv., Inc.*, 220 F.3d 1220, 1230-31 (10th Cir. 2000) (challenge of pretext requires court to look at facts as they appeared to person making the decision to terminate plaintiff).[10] Thus, it makes no

---

[10]  *See also Tesh v. U.S. Postal Service,* 349 F.3d 1270 (10th Cir. 2003) (whether employer's belief is erroneous is irrelevant in pretext inquiry); *McKnight v. Kimberly Clark Corp. et al*, 149 F.3d 1125 (10th Cir. 1998) (employer's actions based on knowledge that turns out to be false does not indicate pretext, where employer had good faith belief); *Hardy v. S.F. Phosphates L.C*., 185 F.3d 1076, 1080 (10th Cir.1999) (pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether

difference whether Brahma Defense was actually doing the same kind of business as was SFPS

or actually going after the same contracts; the only question is whether Ms. Maki had a good

faith belief to understand the code to mean that Brahma Defense was a rival company.  The

overwhelming evidence supports Defendant's position.  The CCR report indicated that Brahma

Defense was listed as a small minority-owned business, that it was a security business, and that

Plaintiff's name was on the report as one of the owners.  Mot., Ex. A (Maki Dep., att. A-1);

Mot., Ex. D (Meier Dep. at 29:16-25). The CCR report also indicated that Brahma Defense had

an NAICS classification of 561612, the code for "security guards and patrol services." *See* note

1, supra.  Plaintiff does not dispute that Brahma Defense's CCR report indicates a selection of

code 561612 as a description of its services, but disputes that it means that Brahma Defense was

providing security guard and patrol services.  This dispute creates no triable issue of fact because

Plaintiff offers no facts or evidence which would suggest that code 561612 does *not* mean that

Brahma Defense was providing security guard and patrol services.

 Plaintiff also argues that Ms. Maki spent time discussing Mr. Aduddell's situation with

him in order to get all the facts, but failed to take the same time to investigate Plaintiff's

situation before terminating her.  However, Ms. Maki's inquiry regarding Mr. Aduddell was

carried out when he first disclosed his affiliation with Alpha Pro, prior to being hired by SFPS.

This was not the same situation with Plaintiff, and Ms. Maki's response cannot be characterized

as inconsistent or pretextual where Plaintiff had not given Ms. Maki the same kind of

forewarning. Based on the above discussion, Ms. Maki was justified in believing that Brahma

Defense was a rival company, and Plaintiff's involvement in that company constituted a conflict

---

that belief was genuine or pretextual).

of interest under SFPS' policy.  As a result, Plaintiff's claim of discrimination based on her termination fails with regard to the manner in which Defendant treated Mr. Aduddell.

> 2.    *Mr. Liming*

Plaintiff also contends that Mr. Liming was similarly situated in terms of his employment level at SFPS and conflicts of interests he had with outside companies. Mr. Liming stated that he held a "resident manager" license for three companies, including SFPS, as required by state statute for companies in the guard service business. Reply, Ex. B at 135. He received a stipend of $200 per month from each of the companies for which he held the resident manager's license. Resp. Ex. A at 136-37.  At the outset of his employment with SFPS, he informed Ms. Maki that he was holding these resident manager licenses only because it was part of income he was receiving at the time, although a "meager source of income" – and not necessarily because it had any real significance  Reply, Ex. A at 147:13-25; 148:1-14.  Mr. Liming did not see any actual or potential conflict in holding these licenses for SFPS as well as other companies, or in receiving the same benefit (the $200 stipend) from different companies, particularly when he had received formal approval from the President of SFPS, Ms. Maki.  Reply, Ex. At at 167:1-10.  Ms. Maki also agreed with Mr. Liming that holding these licenses did not present a conflict of interest, and corroborated Mr. Liming's statement of disclosure prior to his employment with SFPS.  Reply, Ex. B at 213, 244:10-13.  Ms. Meier also echoed the testimony of both Mr. Liming and Ms. Maki, stating that holding a resident manager's license, or security license is not the same as running the company, which is where a conflict could occur. Resp., Ex. D (Meier Dep.): 79-80.

Plaintiff attempts to create a dispute of fact over whether Mr. Liming held a license as a "resident manager" or a "private patrol operations" ("PPO") manager, the latter of which would suggest that Mr. Liming had the ability to direct or manage a PPO company for the company's

owner.  Resp. Doc. 83 at 10.  This purported dispute of fact only detracts from the central question of whether Plaintiff's termination was pretextual for discriminatory motive based on gender.  First, Mr. Liming explained that the private investigator's license which Plaintiff purportedly pulled from the Internet was in error listing him as a PPO. Reply, Ex. A at 134:22-25; Resp. Ex B 140:18-25; 141:1-19.  Plaintiff offers no evidence to suggest that Mr. Liming's explanation is suspect or implausible.  Second, Plaintiff misrepresents testimony when Plaintiff states that Mr. Liming has admitted that he has a conflict of interest with SFPS. Here is what Mr. Liming actually stated in his deposition:

Q.      Would you agree with the statement, you benefit directly from a relationship with a competitor of [SFPS] by receiving $200 a month from [a competitor company]?

A.      You mean in the form of a stipend?

Q.      Correct.

A.      Yes, that's a  –

Q.      It's a benefit, correct?

A.      I think that that is true.

Q.      . . . So you would agree with me, then, pursuant to [the conflict of interest policy], your relationship with those companies create [sic] a conflict?

A.      No.

Resp., Ex. B at 166:8-24.  Mr. Liming did *not* admit he had a conflict, nor can Plaintiff show that the benefit Mr. Liming received from all of the companies for which he held licenses created a conflict between his position at SFPS and the other companies.  Ms. Maki did not think so, either.

       Plaintiff cannot claim that Defendant punished her for conduct which was similar to the conduct of either Mr. Liming or Mr. Aduddell.  Both individuals disclosed their respective

20

situations to SFPS prior to their employment or when they were first employed.  In contract, the full extent of Plaintiff's affiliation with Brahma Defense was discovered by Ms. Meier, who brought it to Ms. Maki's attention.  It is undisputed that SFPS believed that Mr. Aduddell had suspended his license to run Alpha One while he was employed at SFPS; it is also undisputed that Ms. Maki did not consider Mr. Liming to have a conflict of interest because of the licenses he held (whatever licenses they were) with competitor companies.  Thus, Plaintiff cannot show that either Mr. Liming or Mr. Aduddell were similarly situated.

Plaintiff also contends that disparate treatment is shown by the fact that she was promoted to a director position after complaining in February of 2007 to Ms. Maki that the company was discriminating against females.  This notion is absurd. Even at its broadest interpretation, a promotion cannot be considered an adverse action under Title VII: a plaintiff would not normally consider being promoted an action that would dissuade him or her from complaining about discrimination.

Based on the above discussion, Plaintiff cannot show the existence of pretext for her discrimination claims because she has not presented any evidence which would contradict or render implausible the reasons given by Defendant for terminating Plaintiff.

## II.   RETALIATION

Plaintiff claims that Defendant retaliated against her by terminating her after she complained to management about pay disparities between male and female employees at SFPS. Defendant contends that there can be no retaliation claim where Plaintiff's discrimination claim has failed.  The Court disagrees with Defendant.  A plaintiff need not prove that the underlying employment practice by the employer (in this case, alleging that Defendant discriminated against her based on gender by pay disparity and by terminating her) was, in fact, unlawful.  She need

only have a reasonable basis for believing that a defendant's conduct was discriminatory. *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 n.8 (10th Cir. 1994) (noting that retaliation claim does not require that the plaintiff prevail on the underlying claim of discrimination); *Clark Cty Sch. Dist v. Breeden*, 532 U.S. 268 (2001); *Wentz v. Md. Cas. Co.*, 869 F.2d 1153, 1155 (8th Cir. 1989); *Pace v. Abbot Lab*, 215 F.3d 803 (7th Cir. 2000).  However, while Plaintiff's retaliation claim initially survives the dismissal of Plaintiff's discrimination claim, it ultimately fails on its merits.

A.      Prima Facie Case

        Title VII prohibits retaliation because an employee either opposes an unlawful employment practice, or because that employee participated in protected activity. §42 U.S.C. 2000e-3(a).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal nexus between her opposition and the employer's adverse action." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1086 (10th Cir.2007).  An "adverse action" occurs where the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. Defendant does not argue either that Plaintiff did not engage in protected activity under Title VII, or that termination is not an adverse action.  Thus, the only question is whether there is sufficient evidence of a connection between Plaintiff's engaging in protected speech and her termination.

        As with her discrimination claims, Plaintiff relies on circumstantial evidence to establish this causation.  Retaliation claims brought under Title VII may also be analyzed under the *McDonnell Douglas* burden-shifting framework; *Jeffries v. State of Kansas*, 147 F.3d 1220, 1231 (10th Cir.1998) (applying the McDonnell Douglas framework to a claim of retaliation).  Thus, in

22

keeping with this framework, Plaintiff must first demonstrate a prima facie case.  The causal connection may be shown by producing "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kansas, Inc*., 683 F.2d 339, 343 (10th Cir.), *cert. denied*, 459 U.S. 1071 (1982). In other words, Plaintiff must present some evidence that her employer undertook the adverse employment action for the purpose of retaliation. *Bullington v. United Air Lines*, 186 F.3d 1301 (10th Cir. 1999).

In November of 2007, Plaintiff complained to Sherry Meier regarding pay disparities in male and female director salaries.  Plaintiff was terminated about a month later, which would appear to establish a causal connection for a prima facie case.  It is also undisputed that Ms. Maki discovered Plaintiff's involvement with Brahma Defense and confronted Plaintiff two days before terminating her, which would strongly suggest that it was Plaintiff's conflict of interest that resulted in her termination, and not Plaintiff's complaints of discrimination to Ms. Meier. However, even assuming Plaintiff has met a prima facie case, her retaliation claim still fails.

B.       Defendant's Proffer of Legitimate Motives

The same legitimate reasons given by Defendant for Plaintiff's claim of discrimination apply here.  It is undisputed that, by virtue of her employment at SFPS, she knew confidential information which could be detrimental to Defendant in the bidding process.  Plaintiff was majority owner in a company which could reasonably be characterized as a competitor, and Ms. Maki believed that Plaintiff had misled her in failing to fully disclose her affiliation with Brahma Defense.

C.       Pretext

The mere temporal proximity of Plaintiff's protected speech to her termination, without

more, is insufficient to establish retaliatory motive. *Butler v. City of Prairie City, Kan.*, 172 F.3d 736, 744 (10th Cir. 1999) (citations omitted). A court must consider whether evidence of temporal proximity combined with the other factors infer pretextual motive such that Defendant's reasons for terminating Plaintiff would be "unworthy of credence." *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1242 (10th Cir. 2004) (Mere conjecture that the University acted with discriminatory reasons will not suffice to establish pretext).

It is undisputed that Plaintiff made these complaints to Ms. Meier, but there is no evidence that Plaintiff complained to Ms. Maki as well. There are disputes of fact as to the reason why Plaintiff never did so, but none of them are material. Plaintiff told Ms. Meira that she planned on discussing the issue with Ms. Maki herself because she felt she had a "good enough relationship" with Ms. Maki, Resp., Ex. D at 74-75. At the same time (and somewhat inconsistently), Plaintiff also states that she feared retaliation if she did complain to Ms. Maki. Resp., Ex. A (Pltff. Aff., ¶ 5). The point is that there is no evidence that Ms. Maki had any knowledge of Plaintiff's complaints of pay disparity until Ms. Meier told Ms. Maki about them, and only *after* Plaintiff was terminated. Reply Ex. B (Maki Dep. ) at 167:12-22; 213:12-15; 15-22; Resp., Ex. D (Meier Dep.) at 74-75. Plaintiff does not present any evidence that Ms. Maki learned of Plaintiff's complaints from Ms. Meier or anyone else. Ms. Meier stated that she recalled mentioning the conversation she had with Plaintiff to a payroll clerk, but personally did not tell Ms. Maki about Plaintiff's concerns before Plaintiff was terminated. Resp., Ex. D at 69:8-12; 17-24.

Plaintiff's retaliation claim loses steam at this point. Because there is no evidence that Plaintiff complained to Ms. Maki about pay disparity between males and females, and no evidence that Ms. Maki was made aware of these concerns, either by Ms. Meier or anyone else,

Plaintiff is unable to show a causal connection between her protected opposition and her termination. Evidence of a defendant's knowledge is "essential to establishing a causal connection between the adverse action and the protected activity."  *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir.1993).[11]

Plaintiff attempts to make something of the fact that Ms. Maki's stated reason for terminating her was a conflict of interest, rather than misleading her.  *See* Resp. to Deft's Statement of Fact No. 33.  This is an immaterial dispute of fact, because it has absolutely no bearing on Plaintiff's retaliation claim.  Under the relevant law, Ms. Maki could have fired her for any reason – as long as it was not with retaliatory or discriminatory motive. *See Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003) (defendant required only to "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII"); *Stover v. Martinez*, 382 F.3d 1064, 1073 (10th Cir. 2004).  There are no facts which infer that Ms. Maki harbored retaliatory animus towards Plaintiff, particularly when the overwhelming evidence is that Ms. Maki was unaware of Plaintiff's concerns regarding pay disparity. As a result, there is no triable issue of fact on Plaintiff's retaliation claim, and Defendant is entitled to summary judgment on this claim.

## III.   Retaliation Based on Defendant's Counterclaim

Plaintiff also alleges discrimination related to her receiving post-employment benefits,

---

[11]  *See also*, *Carney v. Pena*, 992 F.Supp. 1285, 1293 (D.Kan.,1998) (summary judgment granted on Title VII retaliation claim where person who designed the schedule change did not know plaintiff had filed a complaint); *Jones v. Barnhart*, 349 F.3d 1260, 1269 (10th Cir. 2003) (no causal connection where person denying promotion was unaware of employee's protected activity); *see also Steele v. Kroenke Sports Enterprises, L.L.C.*, unpubl. opin., 2008 WL 360614 (10th Cir. 2008) (employer cannot engage in unlawful retaliation if it does not know that the employee at least in part is engaging in protected opposition).

which seems to be connected to a counterclaim filed by Defendant.  The counterclaim was based on Plaintiff causing Defendant to lose several million dollars by allegedly interfering with Defendant's joint venture with government agencies for a contract to provide security services at the Department of Energy Headquarters in Washington, D.C.  Although Defendant has voluntarily dismissed its counterclaim (Doc. 69), Plaintiff raises this argument in the response to summary judgment.  Defendant does not address this issue in the reply.

Defendant's filing of a counterclaim does not give rise to a retaliation claim.  Plaintiff relies on a Tenth Circuit case, *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106 (10th Cir. 2007) to argue that an employer's counterclaim against a former employee in response to a discrimination lawsuit can constitute an adverse action in a Title VII retaliation claim.  However, the Tenth Circuit stated only that the issue posed an "interesting question." *Id.* at 1123.  The court also noted that the plaintiff's employer had stated legitimate, non-discriminatory reasons for filing its counterclaims, and that plaintiff could not show pretext.   While Defendant has not addressed this issue, the Court considers the stipulation of dismissal of the counterclaim to be relevant.  Further, I find no tinge of bad faith or illegitimate motive associated with the bringing of the counterclaim, given the circumstances surrounding Plaintiff's involvement with Brahma Defense.

Plaintiff also alleges retaliation based on Defendant's spreading lies to third parties about the reasons for her termination, including that she had taken Defendant's proprietary or confidential information while she was employed by SFPS.   Neither party presents significant argument on this issue.  However, the allegation is insufficient on which to premise a Title VII retaliation claim, as it is too attenuated from her protected activity, and there is no evidence of retaliatory motive on Defendant's part.

26

### Conclusion

In sum, I find and conclude that Defendant is entitled to summary judgment on Plaintiff's claim of gender discrimination based on pay.  Plaintiff has not met a prima facie case.  Assuming she has, Plaintiff has not shown any evidence of pretext.  Plaintiff 's claim of gender discrimination regarding her termination is dismissed because Plaintiff has not shown she was similarly situated to the male directors regarding conflicts of interest with SFPS, nor has she shown that Defendant acted with discriminatory motive in terminating her.

Defendant is also entitled to summary judgment with regard to Plaintiff's retaliation claim.  Even assuming she has met a prima facie case, the overwhelming evidence is that Ms. Maki, who unilaterally decided to terminate Plaintiff, was not aware of Plaintiff's concerns regarding pay disparity until after Plaintiff was terminated.

The Court finds no evidence of retaliatory motive on any of Plaintiff's other claims based on a retaliation theory.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's First Amended and Supplemental Complaint (**Doc. 65**) is hereby GRANTED for reasons described in this Memorandum Opinion and Order.  The entry of a Rule 58 Judgment shall immediately follow.

_____
UNITED STATES DISTRICT JUDGE